## COLE v. LUCAS.

A concubine can receive as a donation from her paramour, in moveables, but one-tenth of the value of his whole estate. ..

A slave can receive nothing by donation.

Where one who had been a slave claims a donation of notes, alleging that she had been emancipated, it is incumbent on her to show that the donation was made and the notes transferred subsequent to the act of emancipation. Mere possession of the notes is not evidence of the time when they were delivered.

The domicil of a citizen is in the parish in which he has his principal establishment, which is that in which he habitually resides; and if the place of his principal establishment be uncertain, by reason of his residing in different places, without any formal declaration of intention as provided by law, and under circumstances which render his residence equivocal, either of the places where he so resides may be considered as that of his principal establishment, at the option of those whose interests are thereby affected. C. C. 42.

In a strict legal sense that is properly the domicil of a person, where he has his true, fixed and permanent home, and principal establishment, and to which, when absent, he intends to return.

A domicil once acquired remains until a new one is acquired, facto et animo.

One going to another State for health, pleasure, or any temporary purpose, with the intention of returning, has a mere transitory residence, which constitutes no new domicil, nor an abandonment of the old one. It is not the act of inhabitance which constitutes the domicil, but the fact, coupled with the intention, of remaining.

In cases of doubt the original domicil is considered to be the true one.

In questions of domicil the declarations of the party whose domicil is in dispute are entitled to weight, only when made previously to the event which gave rise to the suit.

APPEAL from the District Court of Catahoula, *Mayo*, J.

*Purvis*, for the plaintiff. The notes sued on were taken by plaintiff before maturity, and for a valuable consideration. The evidence does not establish concubinage between the woman, *Patsy*, from whom he received them, and *Miller*, the payee. The notes, being personal property, had no other *situs* than that of the domicil of the owner, which was in Missouri at the time of their transfer to *Patsy*; and, by the laws of that State, the transfer of negotiable paper, with or without consideration, is valid. *Succession of Packwood*, 12 Rob. 334, 360. 9 Rob. 430. *Saul v. His Creditors*, 7 Mart. N. S. 71. 2 Rob. 253. Civ. Code, 483. Story, Confl. Laws, p. 362. As to the law of domicil, see 1 Kent, 76. Story, Confl. Laws, p. 44. Pothier, Coutume d'Orléans, ch. 1, no. 13. The notes were given to *Patsy* after her emancipation, and the effect of the donation must be determined by the law of Missouri, where the donation was made. Story, Confl. Laws, pp. 96 to 98. In cases like the present the verdict of a jury should not be disturbed. 3 Mart. N. S. 29. 12 La. 233, 290, 319.

*Frost*, G. S. *Sawyer*, *Thomas* and *Snyder*, for the appellant, contended that the notes sued on were delivered to *Patsy* while yet the slave and concubine of *Miller*, the payee, and that she was as such incapable of receiving them; that the plaintiff is a holder in bad faith, and without consideration, and colluded with *Patsy* to defraud the heirs of *Miller*; that the domicil of the latter continued to be in Louisiana, and the donations must be tested by its laws (Story, Confl. Laws, § 366. 4 Mart. 20. 5 Ib. 23. 7 Ib. 24. 2 Mart. N. S. 93); that the form of the donation was not such as to render it valid by the laws of this State (C. C. 483, 1523, 1525. 12 Robinson, 67. 1 Ann. R. 237); and those of Missouri are not in evidence.

The judgment of the court was pronounced by

EUSTIS, C. J. This suit is brought on certain promissory notes drawn by *Hugh Lucas* in favor of *Samuel Miller*, and by him endorsed, forming part of

the price of a plantation and slaves situate in the parish of Catahoula, sold by Miller to Lucas, at Harrisonburg, in said parish, on the 11th May, 1843, which was mortgaged to secure the payment of the notes. They were originally nine in number, for $3,000 each, and payable one every successive year, bearing ten per cent interest if not paid at maturity. The first, that due in 1844, was paid ; and this action is instituted by the plaintiff an endorsee on the eight remaining notes, for the recovery of the amount of $24,000 and interest, and to subject the mortgaged property to the payment thereof. Judgment by default was taken against the defendant, Lucas, who makes no defence. Griffin, curator of the vacant estate of Samuel Miller, deceased, intervenes in this suit, and claims the notes as belonging to the succession represented by him. There was the verdict of a jury against the intervenor, and in favor of the plaintiff, and the former has appealed.

Miller was domiciliated in the parish of Catahoula, on the Tensas river, where he resided for several years. In 1843 he sold his plantation, which was his principal establishment, with the slaves, to Lucas. He then purchased a place on the other side of the river, in the parish of Tensas, where he resided, and his domicil must be considered to have been there, unless changed by subsequent circumstances, as to all the purposes of this enquiry. Being in feeble health he left Louisiana for St. Louis, in April, 1844, where he died on the 21st May ensuing. These notes, after his death, were found in the possession of a mulatress named Patsy, who had formerly been the slave of Miller, and, as is alleged, his concubine, from whom the plaintiff alleges that he bought them, and to whom they were transferred by blank endorsements, and delivered by Miller previous to his death. The contest is between the claims of the plaintiff, as a bonâ fide holder of these notes, and the curator of Miller, who charges that they belong to the succession of Miller, and were obtained by the plaintiff through fraud and collusion with one William Kirk, for the purpose of despoiling the lawful heirs of their property.

This case has been very thoroughly argued, and we are placed fully in possession of all the facts necessary to an understanding of its merits.

I. These notes, it is conceded, once belonged to Samuel Miller, and they belong to his succession, unless some person has a lawful right to them ; the plaintiff presents himself as having that right. He is a resident of the parish of Catahoula; during part of Miller's life he resided no more than a mile from him, and the remainder not more than eight miles; he went to Missouri in the fall of 1844, or early in 1845, and procured the notes from Patsy. From the evidence we are satisfied that the plaintiff is not in the position of a bonâ fide holder of these notes, without notice ; on the contrary, we can recognize in him no rights but those which the person from whom he obtained them had.

II. It is then necessary to enquire into the validity of her claims. She was the slave of Miller and his concubine, and we think the evidence establishes that their concubinage was open and notorious. Under the cumulated incapacity of slave and concubine, she could not receive these notes from Miller as a valid gift, under our laws. The concubine can only receive in moveables one-tenth part of the whole estate of her paramour, and the slave can receive nothing by donation. But it is said she was emancipated on the 13th or 14th of May, 1844, at Madison city, in the State of Indiana, and that her incapacity to receive as a slave was removed by the act of emancipation. To render the gift

valid under that hypothesis, it would be incumbent on the plaintiff to show that the notes were transferred, or given, to her subsequent to the act of emancipation. The mere possession of the notes by her is no evidence of the time when they were delivered to her. The evidence by which the time of delivery is attempted to be fixed we find is extremely unsatisfactory, and not accompanied with that precision with which so important a point of a case ought to be established. The declaration of *Kirk* on this subject is: "After our arrival in Missouri, I gave the notes back to *Miller*, and he gave them to *Patsy*, after her return from Madison, as he himself told me, and I saw the notes in her possession." It is not pretended by *Kirk* that he witnessed the delivery of the notes from *Miller* to *Patsy*; his knowledge is from the *dictum* of *Miller*; all he saw was the notes in the hands of *Patsy*, after her return from Madison. But when were they given to her? Were they, or not, given to her in St. Louis, within your knowledge? was the question to be answered. Where is the proof that she received them only since her emancipation, or on her return from Madison. *Miller* told him so, and this is the only evidence upon which the truth of this fact rests. The charge made by the curator is that the deceased and *Kirk* colluded to defeat the operation of the laws of Louisiana and the rights of his lawful heirs, and it would be idle to attach any importance to the declarations of the deceased made *in re agendâ*, in furtherance of his purpose. Nor do we understand that the answers of *Kirk* on his cross examination, change this declaration of his as to the fact of his deriving his knowledge of the time of the delivery of the notes from *Miller* himself. There is some confusion in relation to this fact in the deposition taken as a whole, but there ought to have been none. The fact ought to have been clearly and substantively established, and it is not a little singular that this witness alone is able to testify in relation to this fact, and he the agent of the deceased and protector of *Patsy*.

*Kirk's* own account of his connection with these notes imposes on all who are in search of the truth the necessity of scrutinizing his testimony. He says: "I saw *Miller myself* endorse these notes. After endorsing the notes, *Samuel Miller* handed them to me, telling me to keep them for *Patsy's* benefit, that he intended to have her emancipated, and that he wanted the notes to enure to her benefit. After *Miller*, whom I accompanied on his last trip to Missouri, arrived there, I gave him back the notes, and he gave them to *Patsy* after her emancipation, on her return from Madison, as he himself told me, and I saw the notes in her possession." *Patsy* accompanied her master and her protector on the trip to St. Louis, and the time of the delivery of the notes, as it is seen, is only stated as coming from the lips of the deceased. *Kirk* does not pretend that he saw it, and whatever he did *see* he speaks of with precision and emphasis: e. g. "*I saw Miller myself*" &c.

The notes having been originally entrusted to *Kirk* in Louisiana for the benefit of *Patsy* and returned to *Miller* in Missouri, the ceremony of re-delivery, under the dominion of a system of laws in which such a farce is supposed to be tolerated, ought not to be left to depend upon the hearsay evidence of its principal actor, repeated by the common agent of both parties.

III.· In support of the validity of the transfer of these notes to *Patsy*, it is urged by the counsel for the plaintiff that the domicil of *Miller* was in St. Louis or in Missouri, at the time it was made, and to constitute that domicil it is conceded that two things must concur, the residence and intention of making it the home of the party. These are facts which it is incumbent on the plaintiff to

establish affirmatively, and it is contended are proved by the testimony of *Kirk*, and the witnesses examined at St. Louis. That when *Miller* sold his estate to *Lucas*, in May, 1843, the motive of the sale was to convert his property into such a disposable form as would enable him to evade the laws of this State, and secure the proceeds for the benefit of *Patsy*, may be considered as established. The delivery and endorsement of the notes to *Kirk*, for that purpose, prove that beyond all question.

On the 14th of August, 1843, *Miller* gave a power of attorney authorising *Kirk* to have *Patsy* emancipated, by taking her to one of the north-western States—Ohio, Indiana, or Illinois. In this procuration he styles himself, "*of the parish of Tensas.*" It appears that *Miller* was apprehensive he would have to take back the property he had sold to *Lucas*, and for that reason purchased the property he then held in the contiguous parish of Tensas.

In reply to the interrogatory, whether *Miller* did declare to witness his intention to make St. Louis, Missouri, or some other county in said State, his domicil, did not purchase property there for the purpose of making said State his home, and did not claim St. Louis as his domicil, *Kirk* responds: " I know it was his intention to make Missouri his domicil. He talked of it as his home; said he had left Louisiana permanently. I believe one reason why he had left Louisiana was on account of the climate not agreeing with him. I do not know of his buying property. I know of his renting a house in St. Louis, and he told me his calculation was to buy property as soon as he could get a good chance to invest." *Kirk* also states that *Miller* often told him that his intention in selling out to *Lucas* was, to remove to Missouri, and settle there for the rest of his life ; and, in April, 1844, *Miller* went to St. Louis, taking with him the remainder of his slaves unsold, and at St. Louis made the same declarations to witness. *Comfort*, a witness, says that he saw *Miller* in St. Louis on the 18th May ; he informed him that he had formerly resided in Louisiana, but had sold his plantation, and had come to Missouri to reside.

As far as we can judge, we should think it established that, when *Miller* sold to *Lucas*, he intended to remove out of Louisiana, at least for such a time as would enable him to realise his purpose of securing to *Patsy* the benefit of the notes he had given, or intended to give, to *Kirk* for her use. But the power of attorney given to *Kirk* to emancipate *Patsy* does not strengthen the proof of that intention, and indicates an absence of any purpose of leaving the State at the time, and within a reasonable time after, it was made ; and there is no act of *Miller* indicative of any intent to leave Louisiana until upwards of ten months afterwards, when he left for St. Louis.

*Dr. Doniphan*, who had been his physician since 1842, and had been frequently at his house, is asked this question : " When said *Miller* left this State, on said trip to the State of Missouri, did you, or not, understand from him it was on account of his health, and that he should return again," &c. ? He answers: " I did : he spoke of having, or expecting to have, to take back his property, as *Lucas* could never pay for it, and for this reason he purchased the place he then held in Tensas parish." The disease with which *Miller* was afflicted and died was the dropsy, and his physician advised him to leave for St. Louis. In the mortuary proceedings had at St. Louis in the succession of *Miller*, he is mentioned as *Samuel Miller, late of St. Louis county.* The inventory, dated 7th January, 1845, contains an account of one man slave and four children, and one woman who had run away in October previous, and not since

COLE
v.
LUCAS.

been heard of, a book-account of $500 against *William Kirk*, one dinner table, two breakfast tables, one feather bed and bedstead, one small bedstead or lounge, and one gun. There is no other matter relied upon by either party, as affecting the question of the change of domicil of *Miller*. The testimony of the witnesses taken orally related to the fact of concubinage ; that of *Kirk* and *Doniphan* was taken under commissions, in answer to interrogatories propounded by the parties respectively.

IV. By our laws the domicil of each citizen is in the parish in which he has his principal establishment, which is that in which he makes his habitual residence ; and if the fact of his principal establishment is rendered uncertain by reason of his residing in different places, without any formal declaration of intention as provided by law and under circumstances which render the residence equivocal, either of the places where he so resides may be considered as that of his principal establishment at the option of the persons whose interests are thereby affected. Civil Code, art. 42. Judge Story, in his Conflict of Laws, § 41, states: " In a strict and legal sense, that is properly the domicil of a person where he has his true, fixed, and permanent home, and principal establishment, and to which whenever he is absent he has the intention of returning." We think this authority to be of great weight, as well from the learning and ability of that eminent judge as from his knowledge and experience derived from an administration for many years of the jurisprudence of different States, in which rights under one of them were brought in conflict with those held under another.

It is generally a difficult matter to determine the place of domicil of persons removing to neighboring or contiguous States; and those who have in view to defeat the operation of laws which they wish to avoid, generally accompany their movements with such declarations and outward demonstrations as will enable them to effect their objects. As the validity of every domicil depends upon its truth, there are certain rules which have necessarily established themselves in aid of judicial enquiries after it; they are the dictates of sound reason, and supported by long acquiescence and the best authority. A domicil once acquired remains until a new one is acquired—*facto et animo*. Ibid, § 47. A person going to another State for health, for pleasure, or any temporary purpose, with the intention to return, has a mere transitory residence, which constitutes no new domicil, nor an abandonment of the old one. It is not the act of inhabitancy which constitutes the domicil, but it is the fact, coupled with the intention, of remaining there. Ib. § 44. In cases of doubt, the original domicil of a party is considered as the true domicil. Such has been the decision of the late Supreme Court in the case of *Gravillon's Heirs* v. *Richards' Executors et al.* 13 La. 299; and such is the jurisprudence of the Court of Cassation. Merlin, Rep. *verbo* Domicile, § 2.

From a careful examination of the evidence, we think it results that the intent, indeed the sole purpose of all the acts of *Miller*, was to secure to the concubine the benefit of the notes which he had delivered to *Kirk*, probably soon after the sale to *Lucas*, in May, 1843; and that his declared intention to leave the State was in order to enable him to effect that object, to which *this* intention was subordinate, and on which it alone depended. If that object could have been affected in any other way, that there was no intention on the part of *Miller* to break up his establishment, and change his residence from Louisiana; and that what was said and done in St. Louis was solely in view of

that object. It was all with a view to the supposed operation of the laws of Missouri upon the incapacity under which he and his concubine labored under the prohibitive laws of this State; and if the notes in the hands of *Patsy* could have been negotiated, and she received the equivalent, the purpose of *Miller* would have been answered, and the Missouri residence no more thought of. He did not leave the State when he first gave the notes to *Kirk*, nor did he intend to leave it when he gave the power of attorney to *Kirk* to emancipate *Patsy* in one of the free States, nor when he purchased the plantation in the parish of Tensas, on the opposite side of the river to that he sold to *Lucas*; and when he left for St. Louis, in April, 1844, his physician swears that he advised him to go on account of his health, and that *Miller* told him he intended to return, which the interests of his property in Louisiana required.

The circumstances which are adduced in support of the change of domicil to Missouri, are certainly of no great weight. The deceased made no investment in St. Louis. It is true he hired a house, but what sort of a house is not told us. He of course must have had a shelter for himself and his slaves. But the inventory shows nothing in the way of furniture, which indicates any thing more than a transient stay there; and there is no proof of any fact that we have been able to find which indicates an intention to remain there except for the purpose of securing the notes to his concubine, through the operation of the laws of Missouri.

V. And in relation to the testimony of *Mr. Kirk*, which has been the object of attack from the counsel of the intervenor, admitting the witness swore to what he saw and what he heard, its effect on legal grounds, without adverting to his position and agency throughout this affair, appears to us to have been misconceived by the counsel for the plaintiff. He urges that the declarations of *Miller*, in relation to his change of domicil, are evidence as part of the *res gestæ*; but, if that be conceded, another question arises as to the weight to be given to them. It is obvious that the declarations of *Miller* as to his intention of changing his domicil, made before his sale to *Lucas*, and the delivery of the notes to *Kirk* for *Patsy's* benefit in Louisiana, would stand on a very different footing from those made since and with a view of legalising what he had done, and giving effect to a violation of our laws. A party can hardly be permitted thus to make evidence to support his unlawful acts. We have understood the rule to be that, in questions of domicil the declarations of the party whose domicil is in dispute are only entitled to weight when made previous to the event which gave rise to the suit. *Thorndike* v. *Boston*, 1 Metcalf, 242. *Kilburn* v. *Bennett*, 3 Ib. 199.

The declarations of *Miller* are not stated to have been made previous to the combination of *Miller* and *Kirk*, made in Louisiana, to secure the notes for *Patsy*. The only residence claimed for *Miller* is during his stay for a few weeks in St. Louis. It is not pretended that he intended to reside there, but the declarations proved show that he had the whole range of the State of Missouri, which alone circumscribed his purpose. Something more than this is required to support the definite requisitions of a legal domicil; the true, fixed, permanent home and principal establishment, to which the party, whenever absent, has the intention of returning. There was no residence in a place where he intended to remain. The matter of intent is thus, as we originally stated, dependent on the original purpose conceived when the sale of the property was made to *Lucas*.

VI. We therefore conclude that it is not proved that a domicil was acquired by *Samuel Miller*, before his decease, in the State of Missouri, and that his original domicil in the parish of Tensas, in this State, was his legal domicil at the time of his decease; that it was incumbent on the plaintiff to prove affirmatively that a domicil was acquired elsewhere, before the original domicil can be considered as changed; and that, even if it were doubtful under which domicil the party died, he would be held, under the rules of law, to have died under the original domicil in Louisiana.

We have thus given the reasons for our conclusions at greater length than usual, because we are under the necessity of reversing the verdict of a jury, and giving judgment in opposition to it. In questions of fact the verdict of juries on conflicting testimony, in matters of fraud, is entitled to great weight. In this case, it will be observed, the rights of the parties, particularly those of the succession of *Miller*, depend merely upon questions of law. They were laid before the jury at length by the charge of the judge, and their application to the facts, with proper discrimination, is no easy task; and it is not at all surprising that a jury should have fallen into error in the conscientious discharge of their duty. Ours is equally imperative. In supervising the verdicts of juries we can surrender none of our constitutional privileges, which give to us the exclusive control over verdicts on all questions of law. The questions of law, as presented by the facts, are in favor of the succession of *Miller*, and his heirs are entitled to the benefit of them.

VII. By the 1468th article of our Code, those who have lived together in open concubinage are respectively incapable of making to each other, whether *inter vivos* or *mortis causa*, any donation of immovables; and, if they make a donation of moveables, it cannot exceed one-tenth part of the value of the whole estate. Those who afterwards marry are excepted from this rule. No issue is made as to the proportion the amount of the gift to *Patsy* bears to the estate, and the only question raised is as to its validity. We have already stated our opinions of the relations subsisting between the parties to this donation. The disabilities under which the law places persons who have lived in this condition, are created for the maintenance of good morals, of public order, and for the preservation of the best interests of society.

When the comity of this State is invoked through its tribunals, to give effect to a donation made in another State, in derogation of the laws and policy of our own, of which a citizen is seeking to have the benefit, and that appeal rests upon the operation of the foreign law, it will be time enough to answer it; but it must not be understood from the circumstance of our not noticing this point of the defence, that we are disposed to underate its gravity and importance. The difficulty of all questions relating to the conflict of laws admonishes us of the propriety of avoiding such as the rights of parties do not render necessary to be decided.

It is therefore adjudged that the verdict of the jury be set aside, and the judgment in favor of the plaintiff reversed. And it is further decreed, that the property of the eight notes, executed by *Hugh Lucas*, the defendant, on the eleventh of May, 1843, payable to the order of *Samuel Miller*, on the first day of March, 1845, 1846, 1847, 1848, 1849, 1850, 1851, 1852, for $3,000 each, secured by a mortgage reserved in an act of sale of a tract of land and slaves made by said *Miller* to the defendant, in the parish of Catahoula, and bearing even date therewith, and in contest in this suit, is in the succession of said

*Miller ;* and that the intervenor, as curator of the vacant succession of *Samuel Miller*, deceased, recover of the defendant, *Hugh Lucas*, $6,000, the amount of the notes which fell due on the first of March, 1845 and 1846, with interest at the rate of ten per cent per annum on $3,000 thereof, from the first of March, 1845 ; and with like interest on $3,000, from the first day of March, 1846; and that the mortgaged property, as described in the act of sale filed with the petition for reference to and description, be seized and sold to pay said sum with interest, and on such terms of credit as will meet the payment of the remaining six notes at their respective maturities ; and, that the plaintiff and appellee pay the costs incurred by the intervention in the court below, and of this court, and the defendant those of the lower court not created by the intervention.