(90 South. 522)

No. 23629.

## TEXANA OIL & REFINING CO. v. BELCHIC.

(Jan. 2, 1922.)

*(Syllabus by Editorial Staff.)*

1. **Attachment** ⊜47(2)—**Burden on defendant to show residence.**

In an action in which an attachment was issued, the burden rested upon the defendant to prove by affirmative and satisfactory evidence his claim that prior to the issuance of the attachment he had established a permanent residence in the state; it being conceded that prior to going to the state he was a resident of another state.

2. **Domicile** ⊜3—**Continues until another is acquired.**

The domicile of origin continues until another is acquired, animo et facto.

3. **Attachment** ⊜47(4)—**Evidence held insufficient to show change of domicile.**

In attachment proceeding against one whose domicile of origin was in another state, evidence relied on by defendant to prove a change of domicile to the state prior to the issuance of attachment *held* not sufficient to overcome the presumption that the domicile of origin continued.

4. **Principal and agent** ⊜69(2) — **Mandate; must account to principal for gifts received from person dealing with him as agent.**

One acting as agent in procuring oral leases must account to his principal for gifts of interests in such oil leases and contracts, made to him by persons who dealt with him as agent, thereby giving him a private interest in oil leases acquired adverse to his principal and without his knowledge.

Appeal from First Judicial District Court, Parish of Caddo; R. D. Webb, Judge.

Action by the Texana Oil & Refining Company against George Belchic. Judgment for plaintiff, and defendant appeals. Affirmed.

Wilkinson, Lewis & Wilkinson, of Shreveport, for appellant.

Blanchard, Goldstein & Walker, of Shreveport, for appellee.

### Statement of the Case.

BAKER, J. Defendant brings up this appeal from a judgment maintaining an attachment and decreeing plaintiff to be the owner of certain interest in two oil leases, which defendant had acquired, without consideration, from one Dickinson, soon after he had obtained from the same person, at the expense and for the account of plaintiff, while acting as its agent, assignments of other interests in the same leases and which plaintiff had reason to believe were the only interests that were so obtained.

The view of the trial judge upon which the judgment appealed from was based is expressed in the opinion that we find in the transcript, as follows, to wit:

"We believe that, when an agent is shown to have had a series of transactions with another for his principal, and to have, during such time, accepted a donation from such person, with whom he dealt, and to have concealed such donation from his principal, the presumption arises that the donation was made in consideration of the transactions which were had, or expected to be made between the agent and the donee [person] with relation to the business under the control of the agent, and that, in the present instance, there is a presumption that the donations were made either as a consideration for the agent having accepted the assignments or for past transactions, or to secure the agent future favors, and that the agent, accepting such donations, was bound to account to his principal.

"The reason given by Belchic and Dickinson for the donations having been made to Belchic is at least very questionable, and, if conceded to be the real reason for the donations, it shows that Mr. Belchic, at least, unthoughtedly, placed himself in a position where his duty to his principal and his wish to gratify his benefactor might come in conflict, and such

reasons, when offered to repel a presumption which arose from concealment, we do not think should be given any consideration.

"It is certain that Mr. Belchic, by reason of his agency for the plaintiff, has made a gain by dealing with Mr. Dickinson for his principal, which was not within the contemplation of his agency; that such gain came to him because of the fact that his management of the business of his principal placed him in a position where he could serve the interest of Mr. Dickinson, and having accepted a gift from Mr. Dickinson and concealed it from his principal, even though it might be that he had not failed and would not fail towards his principal in favor of Mr. Dickinson."

The attachment was issued upon plaintiff's sworn allegation that defendant was a nonresident of the state, and in a motion to dissolve defendant denied that allegation. The facts relating thereto, as disclosed by the evidence, as also those relating to the merits of the case, are substantially as follows:

Defendant was born in Philadelphia; resided there until he was about 23 years of age. His widowed mother, with several brothers and sisters still reside there in the home of the family; and defendant, since leaving, has habitually spoken of Philadelphia as his home. He left there, as we infer from his testimony, in or about the year 1913. He voted there in that year, or in 1914, and has never voted in any other place. He obtained college degrees of Engineer of Mining, Bachelor of Science, and subsequently of Master of Science; his intention and ambition having been to become a consulting geologist in New York City. He was, however, diverted to the mining profession, and entered upon and was engaged therein at the time of the institution and trial of this suit, combining or including the business, as plaintiff's agent, of acquiring interests in oil and gas leases and operating for those minerals. From the time that he left his home he sojourned as he found employment: In Wisconsin, 5 months; in Kansas, 18 months; in Oklahoma for a period not stated; in

Houston, Tex., 11 months. During the latter part of the period thus covered he was employed by G. W. Field, an operator in oil and gas properties, or by companies represented by him, and was so employed in the service of such a company in February, 1918. But the company appears to have been in straitened circumstances at that time, and failed to pay his salary. He therefore accepted an offer to go to Shreveport and take charge there of the business of the plaintiff company, which was in process of being organized by A. G. Werblein, under whose direction he was assigned to duty, and so continued until he was discharged, some 7 months later. He arrived in Shreveport on February 13, 1918. The company was incorporated in Delaware on March 8, following; and it is admitted and proved that he acted under the orders and subject to the approval of Werblein, whose headquarters were in New York, as were also those of the company. We find no reason to believe that, in going to Shreveport, defendant had any more idea of establishing himself there as a permanent resident than he had of so establishing himself in either of the other places in which he had previously found employment. His compensation was fixed at $50 per week, or $200 per month (there being some difference in the testimony on that point), and he was promised and received 500 shares of the stock of the company, of the par value of $1 per share, as a bonus.

In the exercise of the authority vested in him, he on April 23, 1918, acquired, in the name of the plaintiff and as its agent, from W. L. Dickinson, sublessee of the Richardson Oil Company, sublessee of J. W. Dixon, lessee of Fleming Player, owner, a certain part of Dickinson's interest in an oil lease affecting 20 acres of land in the S. E. ¼ of Sec. 26, T. 21. N., R. 15 W., parish of Caddo; and Werblein, in New York, was advised of and approved that transaction.

Two weeks later (on May 7, 1918) defendant, in his individual capacity, for his own account and without informing Werblein, entered into a contract whereby the same Dickinson conveyed to him an undivided half interest in his (Dickinson's) remaining interest in the same sublease for the recited consideration "of $1.00 * * * and other valuable consideration"; it having been admitted on the trial that no consideration passed or was intended to pass save the $1, and there being no explanation of Dickinson's reason for making defendant a gift of that character and in that connection, or of his and defendant's reason for not informing Werblein thereof.

On May 16, 1918, defendant, as plaintiff's agent, and in its name, acquired from the same Dickinson a certain proportion of an interest owned by him in an oil and gas lease affecting 40 acres of land owned by J. S. Noel, and described as N. W. ¼ of the S. W. ¼ of Sec. 25, T. 21 N., R. 15 W., parish of Caddo, the consideration for the conveyance being that plaintiff assumed Dickinson's obligations with respect to the drilling of wells on the land, and agreed to pay him $14,000 to complete a well the drilling of which he had commenced, to wit, $1,000 cash upon the signing of the contract, $2,000 within 10 days, $3,000 within 30 days, and the remaining $8,000 within 60 days, provided the well should by that time have been completed, it being agreed that everything required for the work should be furnished by Dickinson; and Werblein was duly advised of the transaction.

On May 31 following Dickinson conveyed to defendant a one-third interest in the interest still held by him in the lease of the Noel tract for the recited consideration of $10,000, but, as in the case of the Player lease, nothing was paid or intended to be paid, save, perhaps, the sum of $1, and the explanation that Dickinson gives of that do-

nation to defendant is that the land in question was in an undeveloped field, and he thought the donation would be an incentive to defendant to be more careful in the drilling of the well—an explanation which appears remarkable in view of the fact that, under the contract of May 16, defendant, as plaintiff's agent, had bound it to pay Dickinson $14,000 for drilling the well, and the amount of care that was to be devoted to that work was therefore within Dickinson's control, and not that of defendant. We may here add that plaintiff, as defendant's principal, was given no information concerning the donation thus made by Dickinson to its agent.

On June 20, 1918, defendant, without informing Werblein and appearing as "a resident of Philadelphia," and one Laskey, shown to have been his roommate and partner, entered into a contract with Dickinson and his partner (Tarver) which, after reciting that Dickinson had agreed to drill a well on the Noel tract, for which plaintiff was to pay him $14,000, he furnishing derrick, casing, cement, and material necessary to complete a well in what is known as the deep sand, and, after acknowledging that $3,000 of the contract price had been paid, and that $3,000 was payable in 30 days from the date of the instrument, and the balance of $8,000 in 60 days, provided that the well should be finished and completed in that time, proceeds as follows:

"Now, therefore, by this agreement the said W. L. Dickinson agrees to drill the said well at a price of $3.00 per foot, and the said George Belchic and Charles G. Laskey agree to furnish derrick, casing, cement, and all materials for the said well at their expense, it being understood and agreed that the difference between the total cost of $3.00 per foot and the sum of $14,000.00 shall be due and belong to the said Belchic and Laskey in equal proportions, it being agreed and understood * * * that, when the balance of the $14,-000.00 price shall be paid to Dickinson and Tarver, the said Dickinson and Tarver agree to immediately transfer to Belchic and Laskey the difference between the price of $14,-000.00 and the price of $3.00 per foot."

It appears from his testimony that, after this suit was instituted (on October 2, 1918) defendant paid a poll tax in Shreveport and also a property tax upon an automobile that his partner, Laskey, had purchased after the institution of the suit.

Both Dickinson and Belchic deny that, when by the contract of May 16 Belchic bound plaintiff to pay Dickinson $14,000 for drilling the well at his expense, there was any thought of Dickinson's giving Belchic an interest in the result. As to the subsequent contract with regard to the drilling (above recited), Dickinson, on cross-examination, was interrogated and answered as follows:

"Q. When you first made your contract with the Texana Oil Company of May 16, that company being represented by Mr. Belchic, did you at that time have in contemplation the separate and subsequent agreement between Mr. Belchic personally, on behalf of himself and Mr. Laskey, and yourself in regard to the drilling of this well?

"A. I did not.

"Q. Why was that subsequent contract entered into between Mr. Belchic and Laskey?

"A. For this reason: I didn't have a great deal of money, didn't have as many funds as I needed, and I told Belchic that I was crowded. Belchic said, 'Yes,' he said, 'I believe that I can find a party who will pay for this material and relieve you of that cost, if you would be willing to accept the difference between $3 per foot and * * * the contract price of $14,-000.'

"The subcontract made, in which Laskey and Belchic agreed to furnish the materials and I agreed, after the contract price of $14,000 was paid me, that the difference between $3 per foot and the $14,000 should go to the other two."

It will be observed that the answers of the witness are confused, but the distinct impression that we got from his testimony is that he intended the court to believe that the drilling contract of June 20 was altogether an afterthought, and that no such

thing was contemplated in the making of the contract of May 16.

Belchic tells a different story. We quote part of his cross-examination, to wit:

"Q. Now, the contract was made between Texana Oil & Refining Company and Mr. Dickinson on May 16. * * * Now, when was the subcontract, between Mr. Dickinson, Mr. Laskey, and yourself first considered?

"A. I want to explain—will explain fully. Mr. Dickinson or no other contractor would not [sic?] make the contract that Mr. Werblein offered, so I said to Mr. Dickinson, 'I want this for Texana.' I said, 'I will try to get some one to loan me the money to help the contract out if you will consent to take $3 per foot out of the borrowed money and pay balance on that contract.' * * *

"Q. It was before the contract between Texana and Dickinson was actually signed that this conversation between you and Dickinson about the subcontract—

"A. It was.

"Q. Were the terms and conditions of the subcontract between Dickinson, on the one part, and Mr. Laskey and yourself, on the other part [agreed on?] before or at the same time the contract between Mr. Dickinson and Texana was signed?

"A. Before it was signed, I had—Mr. Laskey was not the party in question when this was talked of; I was the party who was getting the money.

"Q. In other words, at the time the contract was signed between Dickinson and Texana, you had made arrangements with Mr. Dickinson that you would subcontract this drilling arrangement whereby Mr. Dickinson would receive $3 per foot, and you and such person as you might be able to get interested would furnish the material, etc., and get the balance?

"A. Expected to subcontract; we were going to get some one, not myself."

As a matter of fact, the person whom defendant found was his roommate and partner, Laskey, and it is worthy of remark in that connection that, though he says that neither Dickinson nor any other contractor would have taken the contract (which Dickinson did take), he has been at some pains to call witnesses who have testified that $14,000 was a reasonable price for the drilling of a well in that field; and we are bound to assume that Dickinson expected to make a profit in drilling the well in question at $3 per foot, which according to his original calculation would have amounted to less than $7,000; and we are informed by defendant himself that he and Laskey expected to make and did make on their subcontract a profit of $2,000. Defendant testifies that it was his intention to turn his share of the profit ($1,000) over to plaintiff, but, though he had ample opportunity so to do, he has not taken that action nor offered to take it.

The drilling under the subcontract was continued until August 7, 1918, when at a depth of 2,275 feet oil was found to the amount of 350 barrels a day, and defendant says that he then accepted the well as completed. It was, however, concluded between him and Dickinson, without consulting Werblein, to drill deeper, and some two weeks later they struck a flow of from 600 or 800 to 1,500 barrels a day, the average being about 1,000 barrels.

It is shown that Werblein paid a short visit to the scene of operations early in July and again in August, between the first and second drillings of the well, and that he returned to New York on both occasions with as little information as to the personal interest that defendant had acquired in the affairs of his principal as he possessed when he came to Shreveport, though he was constantly with Dickinson and Belchic during the several days of his visit on each occasion. He came again on September 19, by which time Dickinson had been paid all that he was entitled to, in view of his contract with Belchic and Laskey, and the balance called for by the contract with plaintiff was due to them, though apparently due to him on the face of that contract.

Belchic had, however, been wiring the most peremptory demands to Werblein for the payment of that balance as due to Dick-

inson, or to a person invented by him and called "Henly," by whom he said money had been advanced, and he notified Werblein that, unless the payment was made promptly, one or the other of those persons would proceed for the forfeiture of the sublease, and yet he admits in his testimony that Henly was purely fictitious, and that Dickinson had been paid all that he was entitled to receive.

His cross-examination reads in part as follows:

"Q. Henly was a fictitious person in your mind?

"A. Absolutely.

"Q. Now, at that time the money that was to be paid—balance by Texana—was money which would eventually come into the pockets of Belchic and Laskey under their contract?

"A. The difference between the amounts would.

"Q. Mr. Dickinson had already received some $7,000 (the amount due him being, say, $6,-843 for drilling 2,281 feet, at $3 per foot), had he not?

"A. Yes, sir. * * *

"Q. He had already at that time received the money that he was going to get out of the drilling contract; and the balance that was to be paid by Texana would not be kept by Dickinson, but would find its way into the hands of Belchic and Laskey, is that true?

"A. That is true."

On September 12, 1918, defendant wired Werblein, saying, inter alia, "Forty-Eight hours is all you have to keep Noel well from forfeiture," and demanding payment, to which Werblein replied on the same day that it was impossible for him to make the payment as demanded, that the forfeiture must be prevented, and that he would be in Shreveport on the 19th, and inquiring who it was that was demanding payment and threatening forfeiture, and on September 14 defendant answered, saying (among other things):

"Forfeiture is being pressed by Henly, the man who advanced me the money. * * * If you can't raise the money in New York, there is no need of your coming down here and

borrowing from the bank, and make me pay it out of the production; am loaded up with bills already," etc.

When on September 19 Werblein arrived in Shreveport, and perhaps prior to that time, he felt that defendant was not dealing with him openly, and he then began making inquiries. Meeting defendant on the street, the latter, adhering to the false representations that he had made by wire, informed him that he (defendant) had borrowed $5,000 from Henly and had furnished $2,000 of his own money to carry on the drilling, and had then borrowed $5,000 from Laskey wherewith to pay Henly; all of which was untrue, as was subsequently admitted. Laskey made his appearance about that time, and the party of three adjourned their meeting and went to a hotel where they had a prolonged conversation in which Werblein was informed for the first time that defendant had bought an interest in the Noel lease, and was also told that he had bought an interest in the Player lease; that Laskey and the defendant had advanced the money required for the drilling under the Noel lease; then that Laskey alone had loaned the money, and in so doing had made use of funds belonging to some company in which he was interested, and, if he did not get it back within a couple of days, he would be placed in an awkward position; and, finally, it was made known to Werblein (or possibly that information came to him afterwards through a hint from Dickinson and an examination of the records of the conveyance office) that defendant and Laskey had taken the subcontract for the drilling under the Noel lease as partners, that Henly was a myth, and that Laskey had loaned no money, but had furnished such material as was required for drilling, though the derrick was not included, and in his examination as a witness he practically declined to give any information as to the value of the material furnish-

ed, and claimed that he and defendant were entitled to $7,000 under their subcontract, which amount was paid to them through Dickinson, to whom alone Werblein insisted that plaintiff was indebted, since it had no drilling contract with Belchic and Laskey, and had been informed of none.

It is conceded that the drilling contract showed a profit of $2,000 in favor of Belchic and Laskey, and Belchic testifies that his share of that amount is due by him to Laskey.

This suit, as we have stated, was instituted on October 2, 1918, and it was followed on October 5, 1918, by a suit in the name of Dickinson for the forfeiture of plaintiff's sublease of the interest in the Noel tract, based upon the ground that the last installment in payment for drilling, called for by that contract, had not been paid within the delay specified; and there was judgment decreeing the forfeiture.

### Opinion.

[1] It is not pretended that, when Belchic left Houston on February 13, 1918, to go to Shreveport, he had, or had ever claimed, any other home than Philadelphia; and the employment by reason of which he came to Louisiana, like that which had taken him into the several other states that we have mentioned, was, to all appearances, precarious. In some of the notarial acts executed by him in Shreveport his residence is not stated; in others it is stated to be Shreveport; in at least one other, and perhaps two, it is stated to be Philadelphia. A notary in a particular city may perhaps, in the absence of other information, include in the preparation of an act the recital that the appearers are residents of such city, but, without special instructions to that effect, a Shreveport notary would be no more likely to assume that a person executing an act before him was a resident of Philadelphia than of any other place in the United States.

The payment by the defendant of a poll tax after this suit was instituted and the attachment had been levied, on the ground that he was a nonresident, was plainly a self-serving performance in aid of his purpose to raise the issue that the ground was not well taken. And the same may be said of the payment of the tax on the automobile, if any significance is to be attached thereto. The writ of attachment was issued in October. The automobile was acquired in November following by the partnership of Belchic & Laskey. If it was assessable at all for the year 1918 to that firm, it was immaterial whether its members were residents or nonresidents, since the liability of the property to taxation was determined by its presence within the taxing jurisdiction. Moreover, the firm appears to have been doing business in Louisiana, and may have been domiciled here, though its members were not. It being conceded that defendant's home was in Philadelphia up to the time that he went to Shreveport, the burden rested upon him to prove by affirmative and satisfactory evidence that he then or thereafter, and prior to the issuance of the attachment, animo et facto established a permanent residence in that city.

[2] This court has held that:

"The party who seeks to avail himself of a change of domicile bears the burden of proving it. So long as any reasonable doubt remains, the presumption is that it has not been changed. The domicile of origin continues until another is acquired, animo et facto." Succession of Simmons, 109 La. 1097, 34 South. 102, citing various authorities.

In another case (First Nat. Bank v. Hinton, 123 La. 1023, 49 South. 694) it was said:

"The question of domicile is one of intention as well as of fact, and where, as in this case, it appears that a domicile has been acquired in another state, the parties seeking to show that it has been changed to this state must overcome the legal presumption that it has not been changed by positive and satisfactory evidence of the establishment of a

domicile here, as a matter of fact, with the intention of remaining here and abandoning the former domicile"—citing Cole v. Lucas, 2 La. Ann. 950; Succession of Franklin, 7 La. Ann. 408; Hyman v. Schlenker, 44 La. Ann. 116, 10 South. 623; Succession of Simmons, 109 La. 1095, 34 South. 101; Marks v. Bank, 110 La. 666, 34 South. 725; Ballard v. Puleston, 113 La. 239, 36 South. 951.

[3] The evidence relied on by defendant to prove a change of domicile to this state prior to the issuance of the attachment herein does not measure up to the requirements as thus set forth, and the trial judge did not err in overruling the motion to dissolve.

[4] Proceeding to the consideration of the merits of the case: The reason assigned by Dickinson for making a gift to defendant of part of his interest in the sublease of the Noel tract (to wit, that he thought it would be an inducement to defendant to be more careful in the drilling of the well) is not only insufficient, but absurd, and the question remains: Why did he make the gift; why did he give defendant part of his interest in the sublease of the "Player" tract; why did he, coincidently with the making of the contract of May 16, whereby defendant, as plaintiff's agent, bound plaintiff to pay him $14,000 for the drilling of the Noel well, agree with defendant to do that work for less than $7,000, and that defendant should find a person who would furnish the required material, be paid the balance of the contract price, and thereby make a profit of $2,-000; and why were those transactions with plaintiff's agent concealed from plaintiff and a tissue of falsehoods resorted to in an attempt to keep them concealed? The answers to those questions are within the knowledge of the parties to the transactions, but, so far as they have attempted to give them, are wholly unsatisfactory. We might deduce from the record what appear to us to be probable solutions, but refrain from so doing for the reason that, in our view, it would unnecessarily lengthen this opinion; it being sufficient for the purposes of the case that the results of the gifts in each of the instances mentioned and of the drilling contract were to place defendant in a position where the interests acquired by him for himself conflicted with those which, as agent, he had acquired for plaintiff, since he thereby became a lessor, interested in the forfeiture of the very subleases which, as plaintiff's agent, he had negotiated, and one of which was actually forfeited, after a well had "come in" largely upon his testimony, and solely because of delay of payment of the balance which, under their contract with Dickinson, the existence of which was concealed from plaintiff, inured to him and his roommate.

The general doctrine applicable to the case, as we see it, is well stated as follows:

"The employee is duty bound not to act in antagonism or opposition to the interest of the employer. Every one, whether designated agent, trustee, servant, or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business or for any valuable purpose, must be loyal and faithful to the interest of such other in respect to such business or purpose. He cannot lawfully serve or acquire any private interest of his own in opposition to it. This is a rule of common sense and honesty as well as of law. The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his service. He may not speculate for his gain in the subject-matter of his employment. He may not use any information that he may have acquired by reason of his employment either for the purpose of acquiring property or doing any other act which is in opposition to his principal's interests. He will be required to account to his employer for any gift, gratuity, or benefit received by him in violation of his duty, or any interest acquired adverse to his principal without a full disclosure, though it does not appear that the principal has suffered any actual loss by fraud or otherwise." 21 R. C. L. 825, § 10.

The Supreme Court of the United States has said:

"It is not enough for one occupying a confidential position who is shown to have secret-

ly received a benefit from the opposite party to say, 'You cannot show any fraud,' or 'You cannot show that you have sustained any loss from my conduct.' Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerous precedent to lay down as law that, unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity, or benefit in violation of his duty or acquires any interest adverse to his principal, without full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received." United States v. Carter, 217 U. S. 286, 30 Sup. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594.

See, also, Leake on Contracts, p. 409; Perry on Trusts, 430; Parsons on Contracts (6th Ed.) 89; Robertson v. Chapman, 152 U. S. 673, 14 Sup. Ct. 741, 38 L. Ed. 592; Wadsworth v. Adams, 138 U. S. 380, 11 Sup. Ct. 303, 34 L. Ed. 984; Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176; Nat. Wire Bound Box Co. v. Healy, 189 Fed. 49, 110 C. C. A. 613; Jackson v. Smith, 254 U. S. 586, 41 Sup. Ct. 200, 65 L. Ed. 418; Civil Code, arts. 3003, 3004, 3005; Gilmore v. Gilmore, 137 La. 162, 68 South. 395.

For the reasons assigned, the judgment appealed from is affirmed.